[No. D022897. Fourth Dist., Div. One. Aug. 20, 1997.]

JOAN EIGNER et al., Plaintiffs and Respondents, v.
GLORIA WORTHINGTON, Defendant;
STATE FARM FIRE AND CASUALTY COMPANY, Intervener and
Appellant.

190

**COUNSEL**

Horvitz & Levy, Mitchell C. Tilner, Peter Abrahams, Genson, Even, Crandall & Wade and Tod M. Castronovo for Intervener and Appellant.

Nachand & Agnew, Charles D. Nachand and Jeffrey A. Agnew for Plaintiffs and Respondents.

**OPINION**

**WORK, Acting P. J.**—In an action arising from hostilities between two neighboring families, State Farm Fire and Casualty Company (State Farm)

refused to defend its insured, Gloria Worthington, having determined—without any investigation beyond merely comparing the complaint's allegations with coverage provisions—there was no policy coverage for the alleged injuries. Later, potentially facing liability for a $240,700 judgment entered against Worthington for covered injuries, as well as tort liability, State Farm intervened and moved to have the judgment vacated based on its "mistake, inadvertence, surprise, or excusable neglect" (Code Civ. Proc.,[1] § 473, subd. (b)), arguing had it known plaintiffs' claims were covered, it would have defended Worthington and obtained a more favorable result. We conclude State Farm's contention the court abused its discretion in denying the motion is meritless. Accordingly, we affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND

In March 1993, Joan and Akira Eigner and their children, Joey, Juliann and Jackie, filed a complaint against Worthington and her son Lester,[2] containing causes of action for assault, violation of Civil Code section 51.7 (hate crimes), harassment, violation of Penal Code section 646.9 (stalking), violation of Penal Code section 653m (obscene, threatening or annoying telephone calls), and invasion of privacy and general negligence. The Eigners alleged as follows: Lester was Worthington's tenant. Beginning in 1988, he subjected the Eigners "to a multitude of verbal threats, vulgarities, prank and malicious phone calls, invasion of . . . privacy, stalking . . . assault . . . harass[ment] . . . attempt[ed] battery . . . verbal threats of violence . . . brandish[ment] [of] weapons . . . as well as other acts. . . ." On one occasion, Lester tried to run Jackie down with his automobile, forcing her "to dive/jump out of the way, with such force as to cause her to fall to the ground and rip her pants, cutting her knee." A sheriff's deputy was summoned and found Lester hiding next to the Eigners' garage "with a long knife on his person."

The Eigners further alleged Lester had attempted to enter their home. "Thereafter, on an erratic basis . . . and regularly during the last year, [Lester] commenced and continued to undertake a course of harassment and stalking . . . ." including:

"a. Sexually oriented verbal vulgarities directed at JOAN EIGNER;

"b. Prank phone calls directed to JOAN EIGNER and the EIGNER family;

---

[1] All statutory references are to the Code of Civil Procedure unless otherwise specified.

[2] Because Worthington and her son share the same surname, we use Lester's first name to avoid confusion. Also, when we are required to refer to the Eigners individually, we use their first names. When the complaint was filed, Joey was 17, Jackie was 14 and Juliann was 9.

"c. Invading the EIGNER's privacy by spying on [them] from the WORTHINGTON balcony and through cracks in the fence while on the EIGNER property;

"d. Pointing a gun at members of the EIGNER family and making threatening gestures;

"e. Stalking and following members of the EIGNER family and in particular JOAN EIGNER, to and from work and . . . errands;

"f. Confronting JOAN EIGNER in public with vulgar and sexually explicitly comments[;]

"g. . . . [T]hreatening JULIANN EIGNER with strangulation if she touched his automobile;

"h. Assaulting JULIANN EIGNER with the use of an automobile while she was on roller skates in front of her house, and in particular, aiming his car and driving his car toward [her] as if to run her down;

"i. Threatening AKIRA and JOEY EIGNER with violence and intimating that LESTER WORTHINGTON had a gun and would use it against AKIRA EIGNER and the EIGNER family;

"j. Assaulting JACKIE EIGNER as described above;

"k. Threatening to kill JOEY EIGNER."

Additionally, Lester and Worthington, through her failure to control him, allegedly "created an atmosphere of fear for [the Eigners'] physical well-being," and caused them "to suffer in apprehension and fear of immediate offensive and/or harmful physical contacts. . . ." As a result of "the violence and threats of violence," the Eigners suffered continuing "mental and emotional distress, embarrassment and humiliation, and *other injuries* according to proof at trial."

Worthington's cross-complaint against the Eigners contained the same causes of action as the Eigners' complaint and additional ones, and claimed both emotional distress and bodily injury. (The Eigner's homeowner insurer promptly accepted a defense.) Worthington alleged, among numerous other things, that the Eigners "have made threats of physical violence," and "have directed profane, vulgar and insulting language toward [her], including . . . phrases [such as] 'you old hag,' and 'you old witch.' " Joey purportedly shot

Worthington's home with rifle pellets, and the Eigner children trampled her garden, threw rocks at her home and destroyed her personal property, including her vehicles.

On June 21, 1993, Worthington tendered the defense of the Eigners' action to State Farm, which provided her homeowner's coverage for third party "bodily injury" and "property damage" claims caused by an unexpected occurrence. Without contacting the Eigners' counsel or conducting any investigation into the nature of the alleged damages, State Farm declined to defend Worthington in a September 21, 1993, letter. The letter advised State Farm had concluded, after "very carefully review[ing] the pleadings and the allegations of the lawsuit as well as the policy in question," there was no potential for coverage because the policy excluded damages arising out of the use of an automobile, and the complaint alleged no other "bodily injury" or "property damage." The letter's closing paragraph stated: "We, of course, are willing to consider any further documentation or information with regard to the issues presented. We request that any supplemental information [or] pleadings be forwarded to us for consideration."

On October 4, Worthington's counsel wrote to State Farm asking it to reconsider its decision. State Farm's counsel responded on November 4, explaining "State Farm does not believe that in determining whether a duty to defend exists it must speculate about unpled third party claims which if pled, might give rise to a duty to defend." State Farm did not change its position, but again advised it would consider additional information.

The March 1994 trial date was continued to allow the parties to attempt settlement with Judge Harrison Hollywood's assistance. In April 1994, they arrived at an agreement under which Lester would be dismissed from the Eigners' complaint without prejudice, because he had no assets or income from which damages could be paid. Worthington, who could no longer afford to finance her own defense, would dismiss her cross-complaint against the Eigners and assign her rights against State Farm to them, in exchange for the Eigners' agreement not to execute on any judgment against her.[3] Worthington, however, refused to enter into a stipulated judgment; rather, she insisted the Eigners would have to establish any right to damages at trial.

At a bench trial, Joan testified Lester's harassment began in 1988 and continued even after the Eigners obtained a restraining order against him in

---

[3]"[A]n insured breaches no duty to the insurance company when he [or she] assigns his [or her] rights against the company to the injured plaintiffs in return for a covenant not to execute." (*Samson* v. *Transamerica Ins. Co.* (1981) 30 Cal.3d 220, 240 [178 Cal.Rptr. 343, 636 P.2d 32].) "When the insurer 'exposes its policyholder to the sharp thrust of personal liability' by breaching its obligations, the insured 'need not indulge in financial masochism . . . .' [Citation.]" (*Id.* at p. 241.)

March 1993. It caused Joan to lose sleep, vomit, develop a skin condition and sustain neck and muscle strains, and scratches and abrasions "in trying to get away from Lester." She was required to see a physician and a chiropractor for physical therapy, and she received "counseling." Each of the other Eigners also suffered some type of physical injury as a result of Lester's conduct, and the family's medical bills were approximately $19,000. Additionally, Worthington's son Chris destroyed a number of the Eigners' trees in October 1993. Worthington presented no evidence or argument. The court found her negligent and awarded Joan $125,000, Akira $30,000, Joey $15,000, Jackie $35,000 and Juliann $35,000. It also awarded the Eigners $700 in property damages.

Several months later, the Eigners' counsel demanded $240,000 from State Farm.[4] State Farm then advised Worthington it "is accepting the tender of defense [under a reservation of rights] based upon the statement of decision by Judge Hollywood." It obtained leave to intervene and brought a motion to vacate the judgment, arguing "[u]p until being provided with the court's statement of decision, State Farm had no notice whatsoever of any claim for covered damages under the State Farm homeowner's policy. [¶] Had State Farm been made aware at any time prior to trial of any claim for potentially covered damages under the State Farm policy, it would have assumed the defense of the defendant, as it has done so now, and a different judgment would likely have been obtained. Thus, the judgment obtained was only due to the mistake, inadvertence, surprise or excusable neglect of intervener State Farm."

The court denied the motion, explaining: "Remember the Code of Civil Procedure. The trial judge at the time of trial may permit amendments to conform [to] proof right up to time of trial and even after the trial is over. . . . every insurance company knows that's the rule. The only way you can control the defense is to take over the defense. [¶] There isn't a defense lawyer worth his salt in the State of California . . . [who would] tell [the] carrier [it has] no coverage and let it go. What you do in that case is defend under reservation. . . . [¶] I have no—no sympathy whatsoever [with] the carrier [which] leaves the insured out unprotected and then comes in later and say[s] 'Oh, we didn't know that that might happen during the course of litigation. And we weren't told about it and, therefore, we should set aside the judgment and start all over again.' I don't think that's fair."

The court's minutes state: "State Farm made its own independent determination of lack of coverage and a conscious decision to refuse to defend its

[4]In California, insurance policies must provide "that whenever judgment is secured against the insured . . . in an action based upon bodily injury, death, or property damage, then an action may be brought against the insurer on the policy and subject to its terms and limitations, by such judgment creditor to recover on the judgment." (Ins. Code, § 11580.)

insured despite repeated claims by the insured. Accordingly, there was no surprise, mistake, inadvertence or excusable neglect." On appeal, State Farm argues the court abused its discretion, because "State Farm was never placed on notice that the Eigners' complaint involved a potentially covered claim."

## THE TRIAL COURT DID NOT ABUSE ITS DISCRETION

### I

■ "It is by now a familiar principle that a liability insurer owes a broad duty to defend its insured against claims that create a potential for indemnity. [Citation.] . . . '[T]he carrier must defend a suit which *potentially* seeks damages within the coverage of the policy.' [Citation.] . . . . [¶] The determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy." (*Horace Mann Ins. Co.* v. *Barbara B.* (1993) 4 Cal.4th 1076, 1081 [17 Cal.Rptr.2d 210, 846 P.2d 792].) An insurer, however, "cannot construct a formal fortress of the third party's pleadings and retreat behind its walls. The pleadings are malleable, changeable and amendable. . . . [C]ourts do not examine only the pleaded word but the potential liability created by the suit." (*Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 276 [54 Cal.Rptr. 104, 419 P.2d 168].) Thus, "facts known to the insurer and extrinsic to the third party complaint can generate a duty to defend, even though the face of the complaint does not reflect a potential for liability under the policy. [Citation.] . . . [T]he third party plaintiff cannot be the arbiter of coverage." (*Montrose Chemical Corp.* v. *Superior Court* (1993) 6 Cal.4th 287, 296 [24 Cal.Rptr.2d 467, 861 P.2d 1153].)

Insurance Code section 790.03, subdivision (h)(3) requires prompt investigation of all claims, and an insurer may breach the implied covenant of good faith and fair dealing by failing to properly investigate its insured's claim. (*Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 817 [169 Cal.Rptr. 691, 620 P.2d 141]; *Betts* v. *Allstate Ins. Co.* (1984) 154 Cal.App.3d 688, 707 [201 Cal.Rptr. 528].) "The risk that an insurer takes when it denies coverage without investigation is that the insured may later be able to prove that a reasonable investigation would have uncovered evidence to establish coverage or a potential for coverage. In that case, the insurer will be liable for the costs of defense already incurred by the insured [citation] and could also be exposed to tort liability. [Citation.]" (*American Internat. Bank* v. *Fidelity & Deposit Co.* (1996) 49 Cal.App.4th 1558, 1571 [57 Cal.Rptr.2d 567].)

■ An insurer contesting coverage "may defend the action with a reservation of rights [citation], it may file a separate declaratory relief action

[citation], . . . or it may simply deny the request and take its chance that the trier of fact in an action alleging bad faith breach of the contractual duty to defend will agree that no defense was owed. [Citation.]" (*Amato* v. *Mercury Casualty Co.* (1993) 18 Cal.App.4th 1784, 1792 [23 Cal.Rptr.2d 73], fn. omitted, overruled on another ground in *Amato* v. *Mercury Casualty Co.* (1997) 53 Cal.App.4th 825, 834-835 [61 Cal.Rptr.2d 909].) When an insurer wrongfully refuses to defend, the insured is relieved of his or her obligation to allow the insurer to manage the litigation and may proceed in whatever manner is deemed appropriate. (*Drinnon* v. *Oliver* (1972) 24 Cal.App.3d 571, 580 [101 Cal.Rptr. 120], disapproved of on another ground in *Johnson & Johnson* v. *Superior Court* (1985) 38 Cal.3d 243, 244, fn. 7 [211 Cal.Rptr. 517, 695 P.2d 1058].)

## II

"The court may, upon any terms as may be just, relieve a party or his or her legal representative from a judgment . . . taken against him or her through his or her mistake, inadvertence, surprise, or excusable neglect."[5] (§ 473, subd. (b).) ■ ■ ■ ■ "Ordinarily, a party seeking relief under section 473 from a judgment, order or other proceeding has the double burden of showing (1) diligence in making the motion after discovering its own mistake, and (2) a satisfactory excuse for the occurrence of that mistake. [Citation.] The court must generally consider the facts and circumstances of a case to determine whether the party was diligent in seeking relief [citation], and whether the reasons given for the party's mistake are satisfactory."[6] (*Billings* v. *Health Plan of America* (1990) 225 Cal.App.3d 250, 255 [275 Cal.Rptr. 80].)

■ State Farm asserted in its motion, "all of the information and evidence presented to State Farm *and learned of by State Farm in its investigation* was that the claim presented was not one for damages covered under the State Farm policy." (Italics added.) However, State Farm produced *no*

---

[5]An insurer has standing to move to set aside a judgment which it might otherwise be required to satisfy. (*Clemmer* v. *Hartford Insurance Co.* (1978) 22 Cal.3d 865, 886 [151 Cal.Rptr. 285, 587 P.2d 1098].)

[6]The disposition of a section 473 motion "rests largely in the discretion of the trial court, and its decision will not be disturbed on appeal unless there has been a clear abuse of discretion. Although precise definition is difficult, it is generally accepted that the appropriate *test of abuse of discretion is whether or not the trial court exceeded the bounds of reason, all of the circumstances before it being considered.* [Citation.] [W]hen two or more inferences can reasonably be deduced from the facts, a reviewing court lacks power to substitute its deductions for those of the trial court. [Citations.]" (*In re Marriage of Connolly* (1979) 23 Cal.3d 590, 597-598 [153 Cal.Rptr. 423, 591 P.2d 911].)

evidence it conducted any investigation whatsoever into the nature of the Eigners' claims before refusing to defend Worthington. State Farm's claims adjuster merely declared Worthington tendered the defense on June 21, 1993; State Farm declined on September 21, 1993; and the Eigners' counsel informed State Farm on September 26, 1994, of the judgment entered against Worthington. The adjuster did not reveal how she determined there was no potential for policy coverage. Likewise, the declaration of State Farm's coverage counsel does not even suggest it made any meaningful effort to investigate the potential scope of the Eigners' claims. The Eigners' counsel's declaration that "I was never contacted by State Farm or any agent thereof, and no inquiry was made as to the nature, type or style of the damages to the various Plaintiffs," stands uncontested.

In arguing the trial court nonetheless abused its discretion, State Farm relies upon *Aim Insurance Co.* v. *Culcasi* (1991) 229 Cal.App.3d 209 [280 Cal.Rptr. 766], in which the court held that in the insurance context, " 'bodily injury' " does not include "emotional distress in the absence of *physical* injury." (*Id.* at p. 220, italics added, fn. omitted.) *Aim*, however, does not concern the propriety of an insurer's section 473 motion to vacate a judgment entered against its insured after a defense was denied without adequate investigation into the underlying facts. No case stands for a legal proposition neither discussed nor analyzed. (*In re San Diego Commerce* (1995) 40 Cal.App.4th 1229, 1234 [47 Cal.Rptr.2d 303].) The question here is whether State Farm was on notice the Eigners' claims of emotional distress potentially included physical injury, or whether it was truly "surprised" by the judgment against Worthington.

State Farm's reliance upon *Lipson* v. *Jordache Enterprises, Inc.* (1992) 9 Cal.App.4th 151 [11 Cal.Rptr.2d 271], is likewise misplaced. There, plaintiff sued for breach of a sales commission agreement and wrongful termination. The employer's carrier refused to defend based on the policy's definition of "occurrence" as an "accident," and California's well-established principle that "wrongful termination or breach of contract in the employment setting is not an 'occurrence' under a general liability insurance policy . . . ." (*Id.* at p. 159.) Four days before trial, however, the parties stipulated to a complaint amendment adding causes of action for negligence and defamation, the latter of which was specifically covered under a policy supplement. After a brief trial in which only plaintiff testified, the court awarded him $100,000 for negligence and defamation.

The Court of Appeal reversed the trial court's denial of the insurer's motion to vacate the judgment, reasoning the amended complaint presented

new claims the insurer could not reasonably anticipate. (*Lipson* v. *Jordache Enterprises, Inc., supra,* 9 Cal.App.4th at p. 160.) There, after tender of defense the insurer and its insured had ongoing communications, and the insured supplied Royal with "various pleadings, discovery documents and factual information," none of which raised the potential of a defamation claim. (*Id.* at pp. 159-160.) In contrast, here State Farm assumed the risk of refusing to defend based solely on a review of the complaint which, on its face, should have alerted a reasonable insurer of the need to further investigate. In fact, at oral argument State Farm's counsel admitted the Eigner complaint was unusual, because most plaintiffs alleging emotional distress also allege accompanying bodily injury.

*Gunderson* v. *Fire Ins. Exchange* (1995) 37 Cal.App.4th 1106 [44 Cal.Rptr.2d 272], is also distinguishable. There, the insureds were served with an action entitled " 'complaint to quiet title to real property, for declaratory relief, and for injunctive relief,' " in which plaintiff sought only to enjoin the insureds from using a portion of her property as an easement. After reviewing the complaint, the insurer refused to defend because the causes of action "contained 'no reference to a claim for bodily injury or property damage.' " (*Id.* at p. 1110.) Likewise, neither the first amended complaint nor the insureds' answer referred to bodily injury or property damage. Nearly one year after the insurer declined the defense, plaintiff advised the insureds' attorney they were cutting trees and committing destructive acts on her property. The complaint was not amended, however, and the case settled before trial without the insurer ever having been advised of any claim of actual, or potential, property damage.

In the insureds' later suit for breach of the insurance contract, the insurer obtained summary judgment. On appeal, the court held the complaint, which alleged only *equitable* causes of action and sought no monetary damages, did not reasonably alert the insurer there may be extrinsic evidence potentially giving rise to coverage, and once coverage had been denied, it had no continuing duty of investigation. Rather, the "extrinsic 'facts' regarding potential liability for property damage have come from speculation about how [plaintiff] might have (but did not) amend her complaint at some future date." (*Gunderson* v. *Fire Ins. Exchange, supra,* 37 Cal.App.4th at p. 1117.) Here, on the other hand, the extrinsic evidence showing potential coverage was available when State Farm declined to defend or investigate. Indeed, State Farm does not contend a reasonable investigation would not have revealed facts giving rise to its duty to defend. Further, unlike in *Gunderson,* our issue is only whether the trial court's decision not to vacate the judgment on our facts was an abuse of discretion.

State Farm also cites *American Internat. Bank* v. *Fidelity & Deposit Co.*, *supra*, 49 Cal.App.4th 1558, for the blanket proposition an insurer always fulfills its fiduciary duty to its insured by merely perusing the complaint and examining its own policy. Actually, the court stated: "The duty of the insurer *may* be fully met by such a review." (*Id.* p. 1571, italics added.) That *American Internat.* intended no "blanket" application by this statement, is evident from its immediate reference to language in *Gray* v. *Zurich Insurance Co.*, *supra*, 65 Cal.2d at page 276, footnote 15, that an insurer is relieved of a duty to defend when a complaint " 'can by no *conceivable theory* raise a single issue which could bring it within the policy coverage.' " (*American Internat.*, *supra*, 49 Cal.App.4th at p. 1571, italics added, quoting *Gray* v. *Zurich Insurance Co.*, *supra*, 65 Cal.2d at p. 276, fn. 15.)

In *American Internat.* plaintiffs were to receive financing for their "dream home" from the bank. When the loan failed to materialize, they sued for breach of contract, fraud, negligent misrepresentation and promissory estoppel, seeking lost profits and emotional distress damages. After a jury found American International liable, the Court of Appeal reversed the $10,000 emotional distress award because it was not compensable under the purely economic theories of liability as a matter of law. American International then sued its insurer for failure to defend, and after a trial in which the court found the insurer's denial was preceded by an adequate investigation, it granted judgment for the insurer. Where, as there, the underlying trial established theories pled did not support an award of bodily injury damages *even if proved,* the conclusion the insurer's limited investigation was reasonable, is appropriate.

*Gunderson* and *American Internat.* are prototypical cases in which pleadings do not contain theories of liability reasonably expected to result in bodily injury or property damage, and which arise from relationships not likely to spawn new theories suggestive of such damages. Here, in contrast, the complaint contained causes of action for assault, harassment, stalking, obscene and threatening telephone calls, and factual allegations of gun use and threats to strangle and kill, causing "mental and emotional distress, embarrassment and humiliation, *and other* injuries according to proof at trial." The trial court was well within its discretion when it concluded State Farm did not carry its burden of showing its neglect was excusable or its "surprise" was caused "without any default or negligence of [its] own, which ordinary prudence could not have guarded against." (*Miller* v. *Lee* (1942) 52 Cal.App.2d 10, 16 [125 P.2d 627].)

## DISPOSITION

The order is affirmed. Eigners to recover costs on appeal from State Farm.

McDonald, J., and McIntyre, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 10, 1997.